Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio



★ ★ ★  ★ ★ ★

# MEMORANDUM OPINION

Nos. 04-08-00716-CR, 04-08-00717-CR, & 04-08-00718-CR

Raul **GALLEGOS**, Jr.,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 216th Judicial District Court, Bandera County, Texas
Trial Court Nos. 08-067, 08-068, & 08-069
Honorable Stephen B. Ables, Judge Presiding

Opinion by:    Catherine Stone, Chief Justice

Sitting:    Catherine Stone, Chief Justice
Phylis J. Speedlin, Justice
Steven C. Hilbig, Justice

Delivered and Filed: February 10, 2010

AFFIRMED

A jury found Raul Gallegos, Jr. guilty of one count of manufacturing methamphetamine, *see*

TEX. HEALTH & SAFETY CODE ANN. § 481.112 (Vernon 2003), one count of possession of

immediate precursors of methamphetamine with the intent to manufacture methamphetamine, *see*

*id.* § 481.124 (Vernon 2003), and one count of possession of methamphetamine. *See id.* § 481.115

(Vernon 2003). The jury assessed Gallegos's punishment at 60 years confinement for manufacturing

methamphetamine, 10 years confinement for possession of immediate precursors of methamphetamine, and 50 years confinement for possession of methamphetamine. After reviewing the record, we conclude there is legally and factually sufficient evidence to support each of Gallegos's convictions. We affirm the trial court's judgments.

## BACKGROUND

Officers from the Bandera County Sheriff's Department received information from an inmate at the Bandera County Jail, Ronnie Morgan, about a clandestine methamphetamine laboratory located at the residence of Russell Koch. Officers arranged for Morgan's release from jail to assist them with their investigation. They subsequently equipped Morgan with a body microphone and sent him to Koch's residence to purchase methamphetamine.[1]

Morgan testified at trial that Koch was working outside of his garage when he arrived at the residence. Morgan greeted Koch upon his arrival and followed Koch into his garage. Upon entering the garage, Morgan observed Gallegos reading a magazine. Morgan knew Gallegos because Gallegos had helped Morgan and Koch prepare materials for the manufacture of methamphetamine in the past. Koch began mixing ingredients for the manufacture of methamphetamine and then heated the ingredients in an electric fryer.

The three men continued speaking with each other for more than twenty minutes. At one point during their conversation, Koch asked someone to get him a clamp. Eventually, Morgan asked Koch if he had any methamphetamine for sale. Koch told Morgan he did not have any methamphetamine available at that time and instructed Morgan to return later that same day. Before

---

[1] A copy of the recorded conversation was introduced into evidence and played for the jury during trial.

Morgan left Koch's residence, Koch asked Morgan to get him some matches.[2] Gallegos remained in Koch's garage as Morgan left.

Morgan met with police following his visit to Koch's residence. Based on Morgan's observations and conversation with Koch, authorities immediately obtained a search warrant for Koch's premises. When the police executed the warrant later that day, they apprehended Koch trying to leave his residence through a side door. Gallegos was found sitting in the bathroom on top of a closed toilet. Officers detected a strong odor consistent with methamphetamine production permeating the premises, and they quickly discovered evidence of a methamphetamine laboratory in Koch's garage. Officers found various items and materials consistent with a clandestine methamphetamine operation inside a tool box in Koch's garage as well as other items in plain view that are commonly associated with the production of methamphetamine. The items and materials seized by police included: glassware; a fryer; dropper containers; a bag of match books; HEET bottles; red phosphorus; iodine; boxes of medicine containing pseudoephedrine; coffee filters; a candy thermometer; clamps; plastic tubing; pH paper; and a glass laboratory rod.

Officers also seized methamphetamine in both liquid and powder form at the scene. A plastic soda bottle containing liquid was found underneath a workbench in Koch's garage approximately five feet from the table saw where Koch had been "cooking." Joel Budge, a lab analyst employed by the Texas Department of Public Safety, testified the liquid contained methamphetamine, which, along with adulterants and dilutants, weighed 420.25 grams. A dish containing 2.88 grams of

---

[2] Chemist Joel Budge told the jury that clandestine manufacturers of methamphetamine will process striker pads from matches to obtain phosphorus, an ingredient required for the production of methamphetamine when a certain formula is used.

powdered methamphetamine was found on a desk in the main living area of the home.[3]  In a locked box also found in the garage, deputies discovered three sealed boxes of medicine, a bottle labeled sulphuric iodine (with contents that appeared to be iodine pellets), and coffee filters that appeared to contain phosphorus.  The medicine boxes indicated they contained pills containing pseudoephedrine.  Numerous firearms were also seized from the garage and home, including a rifle found in the bathroom where Gallegos was located.

Koch and Gallegos were arrested following the execution of the search warrant.  Gallegos was subsequently charged in three separate indictments with manufacturing more than 400 grams of methamphetamine, possession of immediate precursors (pseudoephedrine, red phosphorus, and iodine) with the intent to manufacture methamphetamine, and possession of more than 400 grams of methamphetamine.  All three of Gallegos's cases were consolidated for trial, and a jury convicted Gallegos on all three counts.  This appeal followed.

### SUFFICIENCY OF THE EVIDENCE

On appeal, Gallegos argues there is legally and factually insufficient evidence to support the findings that he: (1) manufactured methamphetamine; (2) possessed immediate precursors of methamphetamine with the intent to manufacture methamphetamine; (3) possessed methamphetamine; and (4) possessed a deadly weapon.  We review Gallegos's sufficiency challenges under well-established standards of review.  *See Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008) (factual sufficiency); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (legal sufficiency).

---

[3] Budge testified that a third exhibit containing .62 grams of powdered methamphetamine was also submitted to the DPS laboratory for analysis; however, the record does not disclose where this exhibit was discovered.

### A. Manufacture of Methamphetamine

To prove the offense of manufacturing methamphetamine, the State had to prove Gallegos knowingly manufactured methamphetamine in an amount of more than 400 grams. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112. "'Manufacture' means the production, preparation, propagation, compounding, conversion, or processing of a controlled substance other than marihuana, directly or indirectly by extraction from substances of natural origin, independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, and includes the packaging or repackaging of the substance or labeling or relabeling of its container. *Id.* § 481.002(25) (Vernon 2003). Evidence demonstrating any of the procedures listed in section 481.002(25) is sufficient to support a conviction for the manufacture of a controlled substance. *Green v. State*, 930 S.W.2d 655, 657 (Tex. App.—Fort Worth 1996, pet. ref'd). The State could establish an offense either by showing Gallegos acted on his own to manufacture methamphetamine or by showing Gallegos, acting with intent to promote or assist with the commission of the offense, solicited, encouraged, directed, aided, or attempted to aid Koch manufacture methamphetamine. *See* TEX. PEN. CODE ANN. §§ 7.01, 7.02 (Vernon 2003).

To obtain a conviction for the manufacture of a controlled substance, the State must link the defendant either to an interest in the place where the manufacturing was taking place or to the actual act of manufacturing. *Webb v. State*, 275 S.W.3d 22, 27 (Tex. App.—San Antonio 2008, no pet.); *Isham v. State*, 258 S.W.3d 244, 248 (Tex. App.—Eastland 2008, pet. ref'd). This may occur through circumstantial evidence. *Webb*, 275 S.W.3d at 27. "Although mere presence at a drug laboratory is insufficient to support a conviction for manufacturing, it is a circumstance tending to

prove guilt that, when combined with other facts, shows that the accused was a participant in the manufacturing." *Id.*

In a typical drug possession case, the State is required to link the defendant to the drug to protect the innocent bystander from conviction based solely upon his or her proximity to someone else's drugs. *Poindexter v. State*, 153 S.W.3d 402, 406 (Tex. Crim. App. 2005); *Gilmore v. State*, No. 2-06-302-CR, 2008 WL 706621, *2 (Tex. App.—Fort Worth 2008, no pet.) (mem. op., not designated for publication). Factors commonly used to affirmatively link a defendant in a drug possession case include whether: (1) the accused was present when the search was conducted; (2) the contraband was in plain view; (3) the accused was in close proximity to and had access to the contraband; (4) the accused was under the influence of narcotics when arrested; (5) the accused possessed other contraband or narcotics when arrested; (6) the accused made incriminating statements when arrested; (7) the accused attempted to flee; (8) the accused made furtive gestures; (9) there was an odor of contraband; (10) other contraband or drug paraphernalia was present; (11) the accused owned or had the right to possess the place where the drugs were found; (12) the place where the drugs were found was enclosed; (13) the accused was found with a large amount of cash; and (14) the conduct of the accused indicated a consciousness of guilt. *Evans v. State*, 202 S.W.3d 158, 162 n.12 (Tex. Crim. App. 2006).

By contrast, in a drug manufacturing case, while the State must still provide a link, the purpose of such a requirement is to protect the innocent bystander who merely inadvertently happens onto a methamphetamine lab. *Gilmore*, 2008 WL 706621 at *2. "Although the analysis is basically the same whether the offense is the possession of a controlled substance or the manufacture of a controlled substance, the factors considered may be different." *Id.* For example, the manufacture

of methamphetamine occurs in the open, whereas possession may occur in a drawer or an envelope. *Id.* When methamphetamine is manufactured, it typically generates a strong odor, not merely a residual odor. *Id.* The paraphernalia used in methamphetamine manufacturing are relatively cumbersome and typically are in plain view, and the quantity of contraband will be relatively high. *Id.* "As a consequence, the fact that a defendant has a prolonged presence on the premises weighs more heavily against that defendant when methamphetamine is being manufactured on the premises than it does in a mere possession case." *Id.*

In this case, Gallegos contends he was nothing more than an innocent bystander at the clandestine methamphetamine laboratory found at Koch's residence. The record, however, refutes this contention. The jury heard evidence linking Gallegos to the actual act of manufacturing methamphetamine. First, the State introduced the audio recording of Morgan's conversation with Koch, from which the jury could infer Gallegos provided assistance to Koch in preparing the clandestine methamphetamine lab for operation. The audio recording reveals an apparent exchange between Koch and Gallegos wherein Koch asks Gallegos for a clamp and then directs Gallegos to the location in the garage where the clamps are located. The record shows that when officers executed their search warrant later that day, a clamp was discovered in the part of the laboratory where the methamphetamine production had occurred. Second, the jury heard the testimony of David Vaught, an officer from the Bandera County Sheriff's Department, who stated Morgan had indicated to him that Koch and Gallegos were in the process of manufacturing methamphetamine while he was at the residence. According to Vaught, Morgan told him "they were right in the middle

of . . . cooking [methamphetamine] or blowing off a cook."[4] In light of such evidence, we believe the jury was free to conclude that Gallegos was an active participant in the manufacturing of methamphetamine.

Alternatively, Gallegos asserts the record is devoid of any evidence demonstrating he knew Koch's unlawful intent when he purportedly handed Koch the clamp. Once again, the record does not support Gallegos's contention. The record shows Gallegos attempted to hide from police (in a bathroom) when officers raided the suspected methamphetamine laboratory. The jury also heard testimony indicating Gallegos had a prolonged presence at a place where a strong odor commonly associated with the manufacturing of methamphetamine was detectable.[5] Next, the jury heard that officers discovered in plain view a variety of items and materials indicating methamphetamine manufacturing. Finally, Morgan testified that it is uncommon for a person to stay around a methamphetamine laboratory if he or she is not assisting with the manufacturing process in some manner and that Gallegos had assisted him and Koch manufacture methamphetamine in the past by "pulling matches."[6] Based upon such evidence, we conclude the record shows Gallegos was cognizant of Koch's unlawful intent and aided Koch's unlawful manufacture of methamphetamine.

---

[4] *See Poindexter*, 153 S.W.3d at 406 (stating a jury is entitled to consider inadmissible hearsay admitted without objection). Although Morgan testified at trial that he did not observe Gallegos assisting Koch manufacture methamphetamine, the jury was free to disbelieve such testimony in its role as factfinder. *See Stogiera v. State*, 191 S.W.3d 194, 196 (Tex. App.—San Antonio 2005, no pet.) (recognizing the jury evaluates the credibility and demeanor of witnesses and determines the weight afforded contradicting testimony).

[5] Gallegos was present at Koch's residence at the start of the manufacturing process and was still there hours later when officers executed their search warrant.

[6] "Pulling matches" is a term used to describe the process where an individual separates matches from matchbooks for purposes of collecting the phosphorous off of the striker pads to use in the manufacture of methamphetamine. This process usually occurs before the actual "cooking" of methamphetamine.

Lastly, Gallegos argues his conviction for manufacturing methamphetamine cannot stand because there is no evidence any of the procedures listed in the statute's definition of manufacturing were occurring at the time of his arrest. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.002(25) (stating manufacture means the production, preparation, propagation, compounding, conversion, or processing of a controlled substance other than marihuana, directly or indirectly by extraction from substances of natural origin, independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, and includes the packaging or repackaging of the substance or labeling or relabeling of its container). Gallegos's argument, however, ignores the fact that officers discovered liquid containing methamphetamine when they searched the premises. This methamphetamine, together with the cumulative force of all the other incriminating circumstances, suggests methamphetamine processing was still ongoing at the time officers raided Koch's residence. We therefore reject Gallegos's contention on appeal.

**B. Possession of Immediate Precursors of Methamphetamine**

To prove the offense of possession of an immediate precursor with the intent to manufacture methamphetamine, the State must show a person, with the intent to unlawfully manufacture methamphetamine, possessed an immediate precursor of methamphetamine. TEX. HEALTH & SAFETY CODE ANN. § 481.124(a)(2). In this case, the State could establish an offense by showing Gallegos either: (1) acted on his own; or (2) acted with the intent to promote or assist the offense by soliciting, encouraging, directing, aiding, or attempting to aid another person in the commission of the offense. *See* TEX. PEN. CODE ANN. §§ 7.01, 7.02.

Gallegos was charged with possessing the following precursor substances: pseudoephedrine; red phosphorous; and iodine. Although Gallegos acknowledges that the possession of these

substances is a violation of the law if possessed under the right set of circumstances, he believes those circumstances are not present in this case because the State failed to introduce evidence establishing the substances seized by police were actually pseudoephedrine, red phosphorous, and iodine. We are unpersuaded by this contention because the State introduced sufficient evidence establishing the substances authorities seized were, in fact, the precursors alleged in the indictment.

The record reveals the State presented the testimony of a laboratory chemist, Joel Budge, to establish the identity of the red phosphorous and iodine confiscated by authorities. Budge testified iodine is "very easy to recognize" due to its distinctive odor and appearance. He stated iodine is known to cause staining and will stain "everything around it . . . brown." Budge explained he examined a plastic bottle of gray pellets and concluded, based upon his observations of the substance, the substance could be nothing other than iodine. As for the red phosphorous, Budge noted it is "real easy to recognize" because of its "characteristic appearance." Budge testified he examined a plastic bottle containing red powder and conducted a preliminary test on the substance, which "turn[ed] positive" for red phosphorous. Based on his observations, Budge believed the red powder analyzed was red phosphorous. The jury, as the factfinder, was free to believe Budge's testimony, determine what weight to give it, and draw any reasonable inferences in determining the nature of the substances analyzed. *See Stogiera v. State*, 191 S.W.3d 194, 196 (Tex. App.—San Antonio 2005, no pet.). The jury apparently believed Budge's testimony as to the identity of the iodine and red phosphorous seized by authorities, and we must defer to such findings on appeal.

As for the remaining substance at issue, the State introduced the sealed packages of medicine containing pseudoephedrine confiscated from Koch's premises. The labeling on the sealed packages indicates each package held medicine containing pseudoephedrine. This labeling served as proof

of the contents of the packaging and therefore established the identity of the substance for the jury. *See Shaffer v. State*, 184 S.W.3d 353, 361 (Tex. App.—Fort Worth 2006, pet. ref'd) (holding evidence was legally and factually sufficient to prove appellant was in possession of pseudoephedrine where the sealed cold medicine packages introduced by the State included labeling indicating its contents contained pseudoephedrine). Because the State was able to establish the identity of the substances for the jury through the evidence it presented at trial, *see generally Manning v. State*, 637 S.W.2d 941, 943 (Tex. Crim. App. 1982) (indicating State must present chemical analysis or other evidence to establish the identity of a controlled substance), we must overrule Gallegos's contention.[7]

Gallegos further contends there is legally and factually insufficient evidence to support his conviction because there is no evidence linking him to the pseudoephedrine, red phosphorous, or iodine seized from Koch's premises. Regardless of whether the evidence is direct or circumstantial, it must establish the defendant's connection with an illegal substance was more than fortuitous. *Evans*, 202 S.W.3d at 161. When, as here, the defendant is not in exclusive possession of the place where the illegal substances are found, the State must show additional links between the defendant and the contraband. *Poindexter*, 153 S.W.3d at 406. The number of factors linking the defendant to the contraband is less important than the logical force with which all the evidence, both direct and circumstantial, connects the defendant to the contraband. *Evans*, 202 S.W.3d at 162.

Gallegos points our attention to various record excerpts suggesting that none of the contraband items belonged to Gallegos. In deciding whether the evidence is sufficient to link the

---

[7] ▲ Having determined there is sufficient evidence establishing the substances seized were pseudoephedrine, red phosphorous, and iodine, we reject Gallegos's alternative contention that the court's "charge leaves open the strong possibility that the jury convicted [Gallegos] of committing an offense for which there is legally insufficient evidence."

accused to contraband, however, the trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given to their testimony. *Poindexter*, 153 S.W.3d at 406. The jury was thus free to disbelieve the testimony in question and we will not intrude upon the jury's evaluation of such testimony on appeal. *See id.*

Although Gallegos did not own the residence where the precursors and other contraband items were discovered, he nevertheless had a prolonged presence at the location despite the strong odor of methamphetamine production and the open and obvious presence of weapons, drugs, and other items needed to manufacture methamphetamine. Gallegos was found in close proximity to the area where the precursors and other items were discovered by police. Further, the record shows Gallegos actively participated in the manufacturing operation at Koch's residence and even attempted to hide from authorities when officers arrived to execute their warrant. We believe the logical force of these factors is sufficient to link Gallegos to the precursors.

### C. Possession of Methamphetamine

Besides convicting Gallegos of manufacturing more than 400 grams of methamphetamine, the jury also found Gallegos guilty of possession of more than 400 grams of methamphetamine. To prove unlawful possession of methamphetamine, the State must show a person knowingly or intentionally possessed the controlled substance. TEX. HEALTH & SAFETY CODE ANN. § 481.115. In the case at bar, the State could establish an offense either by showing Gallegos acted on his own or by showing Gallegos acted with the intent to promote or assist the offense by soliciting, encouraging, directing, aiding, or attempting to aid another person in the commission of the offense. TEX. PEN. CODE ANN. §§ 7.01, 7.02. "The mere presence at a place where contraband is being used or possessed by others does not justify finding that a person is in joint possession or is a party to

an offense." *Roberson v. State*, 80 S.W.3d 730, 735 (Tex. App.—Houston [1st Dist.] 2002, pet ref'd).

Gallegos argues there is insufficient evidence to support his conviction for possession of methamphetamine because there is no evidence linking him to the controlled substance seized from Koch's premises. This argument is essentially the same argument he raised to challenge his conviction for possession of immediate precursors of methamphetamine. As discussed in our disposition of Gallegos's sufficiency complaint above, the record contains ample evidence linking Gallegos to the contraband and other items seized by authorities. We therefore overrule Gallegos's sufficiency complaint for the same reasons discussed in our disposition of his complaint concerning the sufficiency of the evidence linking him to the precursors of methamphetamine.

**D. Possession of a Deadly Weapon**

Gallegos contends the evidence is insufficient to support the finding that he used or exhibited a deadly weapon during each offense. Evidence the appellant personally used or exhibited a deadly weapon is not necessarily required when he is a party. *Torres v. State*, 233 S.W.3d 26, 30 (Tex. App.—Houston [1st Dist.] 2007, no pet.). When, as here, the appellant is a party, evidence demonstrating the appellant knew a deadly weapon would be used or exhibited is sufficient to support a deadly weapon finding. *Id.*

In this case, the jury could conclude Gallegos was aware a deadly weapon would be used in the commission of the offenses. The record shows Koch and Gallegos were engaged in manufacturing and possessing contraband and that multiple firearms were located at the scene of the illegal activities. Many of the weapons seized by police during the raid on Koch's premises were

visible to anyone entering the premises. The record further reveals Gallegos was in close proximity to the weapons during his participation in the illegal activities, and that he was apprehended by police in a bathroom where a rifle was located. Based on these circumstances, a trier of fact could rationally conclude Gallegos knew of Koch's intent to use the firearms to facilitate the commission of the alleged offenses. Accordingly, we reject Gallegos's sufficiency complaint.

### DOUBLE JEOPARDY

At the conclusion of oral argument, we invited Gallegos to submit a post-submission brief regarding a double jeopardy issue not raised below or in his original appellate briefing. Gallegos's post-submission brief asserted his convictions for manufacturing and possessing the same methamphetamine violates double jeopardy principles. "[A] double jeopardy claim may be raised for the first time on appeal . . . when the undisputed facts show the double jeopardy violation is clearly apparent on the face of the record and when enforcement of usual rules of procedural default serves no legitimate state interests." *Gonzalez v. State*, 8 S.W.3d 640, 643 (Tex. Crim. App. 2000). Any double jeopardy violation in this case is not clearly apparent on the face of the record. As a result, we decline to address Gallegos's double jeopardy complaint on appeal.

### CONCLUSION

Having considered the evidence in the light most favorable to the verdicts, we conclude a rational trier of fact could have found Gallegos guilty of each of the offenses alleged in the indictments. *See Clayton*, 235 S.W.3d at 778. Further, after reviewing the evidence in a neutral light, we cannot say the evidence supporting these convictions is so obviously weak as to undermine

confidence in the factfinder's determination or is greatly outweighed by contrary proof.  *See Lancon v. State*, 253 S.W.3d at 705.  Accordingly, the trial court's judgments are affirmed.

Catherine Stone, Chief Justice

DO NOT PUBLISH